HOLENSHADE (SCHWARZEL v.). See Case No. 12,506.

## Case No. 6,600.

### The HOLDER BORDEN.

[1 Spr. 144;[1] 10 Law Rep. 193.]

District Court, D. Massachusetts. April, 1847.

CREW OF WRECKED SHIP AS SALVORS—CONSTRUCTION OF SHIP OUT OF REMNANTS—WHO ARE OWNERS.

1. Where a whale ship, owned in Fall River, was wrecked near to a very small and low sand island, in the Pacific Ocean, uninhabited, and at a great distance from any other land, and the crew, with great labor, rescued a part of the oil from the water, and placed it upon the island, and it afterwards came to a place of safety; *held*, that the crew were not salvors.

[Cited in The Antelope, Case No. 484.]

2. The master and crew, as the only means of escaping from the island, and saving property, built a schooner of thirty seven tons burden, and for this purpose used remnants of the wrecked ship, which were of no value to her owners; *held*, that the remnants were rightfully so used, and that the schooner was the property of the master and crew who built her.

3. In this schooner they conveyed the cables and anchors of the wrecked ship, and a part of her oil, to Oahu; *held*, that the master and crew were entitled, as owners of the schooner, to compensation for such transportation.

[Cited in Strout v. The Cuba, Case No. 13,-549; The Aguan, 48 Fed. 322.]

4. At Oahu, the master, in order to rescue a part of the crew left on the island, and a quantity of oil which had also been left there, purchased a brig, and in payment gave a draft on Nathan Durfee, one of the owners of the wrecked ship, who accepted and paid the draft; *held*, that Durfee then became sole owner of the brig.

5. With this brig, the master of the lost ship, proceeded to the island, and with much risk took on board the part of the crew, and oil, which had been left there, and brought them safely to Fall River; *held*, that the owner was entitled to recover compensation for the service, over and above his expenses and risk, and had a lien therefor.

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

This was a suit against certain remnants, and oil, of the whale ship Holder Borden, promoted by her master and crew, and Nathan Durfee. The Holder Borden, of four hundred and forty-two tons, sailed from Fall River in November, 1842, on a whaling voyage to the South Seas and the Pacific Ocean, J. J. Pell, master, with thirty-six officers and men. Her cost, when fitted for the voyage, was $40,000. Having been out seventeen months, during which time she had been successful in taking oil, on the night of the 12th of April, 1844, in lat. 26° 1' N., lon. 174° 51' W., she struck on the weather side of a coral reef, near an island, not down on the chart. She was soon got off, but in ten minutes afterwards struck again, and went upon the weather side of a rock that lay up to the surface. In two hours more she had knocked off her rudder, broke her pintles, and sustained other damage; and had four feet of water in her hold. The officers, fearing that with the full tide, heavy rollers might come in and open the ship, ordered the boats to be made ready, and provided with bread and water. At daylight, the lower hold was filled with water. Land was seen about four miles distant, and the captain at once proceeded on shore, to ascertain its character. It was a low sand island, rising but a few feet from the water, about three miles in circumference, without a tree or shrub upon its whole surface, and surrounded by shoals, rocks, and coral reefs, extending on one side to the distance of twenty-five miles. On returning to the ship, the captain ordered the masts to be cut away, and water to be got from the hold. The chronometer, charts, and other instruments of navigation, together with some bedding, were obtained, and placed in a boat. All that day the ship remained on an even keel, and the crew were diligently employed in getting everything possible from between decks, in anticipation of her falling over. Among other things, they had got upon deck about a thousand feet of pitch-pine plank; at the order of the master, who already contemplated the construction of another vessel, as the only means of escape from the island. At sundown, all hands went on shore to pass the night. On landing, they turned to look at the ship, and to their bitter disappointment, saw her fall over seaward, and the fruit of their day's toil thrown overboard. On their return to the vessel, the next morning, they found that she had rested upon a shelving rock, and in falling over, had slid into deep water, so that all but about three feet of her larboard shear plank was under water. By nailing battens to the deck, however, they secured a foothold, and succeeded in obtaining from between decks three or four light spars, a coil or two of rigging, and one or two sails. The spars were landed that evening. The mate and a seaman, who were left on shore that day, to search for water,

after much labor discovered it, of a tolerable quality, by digging, near the centre of the island. All the next day was spent in breaking up the outside of the ship, to obtain timbers, and in clearing away the rigging, in order to tow ashore the masts, which had been cut away. As they had saved very little provisions, it became necessary to begin to work in the lower hold, which was deep under water, to obtain them. Among the crew were two divers, natives of the South Sea Islands. By offering them increased wages, and other additional inducements, the master prevailed upon them to go into the hold, and hook on to whatever they could reach. They first went down the after-hatch, and fastened successively on a number of casks. Each time, the full crew hoisted away, but could start nothing. During three days, they tried everything accessible in the three hatchways, and were unable to move one cask a single inch, though they straightened their hooks, and broke the falls, with their efforts. The master states, in his testimony, "everything was Jacksoned, chocked, and we could not start it." They then resolved to cut a hole through both decks, and thus reach the provisions, although the lower deck was four feet under water. For this purpose, their only instrument was a single whaling-spade. This was kept in constant activity for thirty-six hours, being passed from hand to hand, when it was found that a hole had been cut, just large enough to admit the passage of a cask. The labor of the next five days secured to them three barrels of bread, thirty of salted provisions, and 200 casks of oil. Subsequently, with the same instrument, and the same persevering toil, they cut four other holes through both decks, through which they raised 600 barrels of oil, and left them floating between decks for safety. When they reached the provisions, they hoisted them upon deck, and having becketed them, to keep them from floating off, threw them overboard. From six to twelve barrels, only, a day, could be taken from the shore in pleasant weather. The beach was soft, like quicksand, and they were obliged to cover it with planks for a hundred feet, and roll the casks, up this floor, to the solid land. They were then placed in tiers, and covered with grass, to protect them from the sun. In this toilsome way, 1400 barrels of oil, and a quantity of provisions, were landed. Six days after the wreck of the Holder Borden, the captain set the carpenter and three men at work, to construct a schooner, out of the materials which had been obtained from her. It involved much sagacity, and patience, and toil. They were entirely without tools, and almost without resources for producing them. They manufactured two saws, out of iron hoops, about eight feet long. With these rude implements, they sawed out the larger timbers, splitting some of them, their entire length, three times, and converted the

ship's spars and knees, into plank and flooring, with the most patient assiduity. They took the ship's try-pot, fitted a cover to it, and to this secured a steam-box, for steaming the plank to be fitted to the new vessel. A half-cask of sea-coal, and the ship's bellows, were the only appliances for blacksmithing which they had saved. They burnt several coal-pits, using wood rescued from the wreck. Having set up a forge, they manufactured their own axes, adzes, and augers. "I never saw anything like the augers," said the captain, "but they answered our purpose." Having got their vessel built, at last, they made oakum, manufactured caulking tools, caulked the schooner inside and out, and painted and pitched her, from materials preserved from the ship. They had reduced the ship's spars; and for standing rigging, they used the unlaid strands of a stream cable. For sails, they made over the ship's canvas. The schooner was of thirty-seven tons, and thirteen feet beam. The labor of launching remained, and the soft beach rendered it almost an impossibility. The work was commenced early in the morning; and though the most extraordinary efforts were used, it was late in the afternoon, before they were able to float their little craft, which they very appropriately named "The Hope." Immediately on being launched, she went over plank shear to the water. Here was a new difficulty, which was to be conquered only by the same persistent exertion, which had marked every step in their undertaking. At last, having got on board provisions, water, and thirty barrels of oil, with whatever ballast of a heavier sort they could obtain, the schooner was found to be sufficiently stiff for her voyage; and the captain, leaving eleven men upon the island, to take care of the oil, with a promise of his speedy return, set sail, the next morning, with the remainder of his crew, after nearly five months spent in incessant toil, under a torrid sun, upon this desolate island. In twenty-three days, they reached Oahu in safety. Being unable to charter a vessel, at a reasonable rate, to run back to the island, the master purchased the brig Delaware, for $6000, for, and in the name of Nathan Durfee, one of the owners of the Holder Borden, and drew on him for the amount. Having made necessary preparations for his return, he set sail, and in eleven days made the island. Large quantities of the oil had been lost by leakage, through the negligence of the men, who had allowed the casks to become uncovered, and exposed to the sun. Twenty-six days of exhausting and perilous effort, were spent in placing the remaining oil on board. Having been wind-bound for eight days, during which time they were exposed to great perils from storms and reefs, they set sail for Oahu, on the 14th of December, and arrived at that port, January 8th, after a hard passage, and with their vessel in an extremely leaky condition. Indeed, it was found, on examination, that her sheathing was all that had kept her afloat, the oakum being all out of her seams. At Oahu, the Delaware was repaired and refitted, and sailed thence for home, on the 9th of February. She arrived at Fall River, July 8th, 1845, having again encountered, in her home passage, very severe weather, bringing the oil and some remnants of the Holder Borden. A libel was filed in admiralty, by the master and seamen, and process in rem issued, against all that was saved from the Holder Borden. The underwriters upon the Holder Borden and catchings, intervened as claimants, having paid as for a total loss. Some of the questions of fact at issue, were referred to T. D. Eliot, Esq., of New Bedford, as assessor, who made his report thereon.

T. G. Coffin, for libelants.

J. H. Clifford, for claimants.

SPRAGUE, District Judge. 1. Are the officers and crew of the Holder Borden, to be deemed salvors, in rescuing from the waves, and placing upon the island, the oil and fragments of the vessel? In the case of The Neptune, 1 Hagg. Adm. 227; The Massasoit [Case No. 9,260]; and the recently reported case of The Reliance, 2 W. Rob. Adm. 119,—it is decided that, in case of shipwreck, and part of the vessel being saved by the exertions of the crew, they are entitled to wages; but cannot be deemed salvors, unless under very extraordinary circumstances. It is insisted, that this case comes within that exception. Immediately upon the disaster, the captain resolved upon building a schooner, as the only means of escaping from the island. He put upon this service as many men as could be employed to advantage, and it took nearly five months to complete her for sea, during which time the residue of the crew had no other employment than that of saving the oil. The weather was fine, the sea was smooth, and although the service was laborious, it was not attended with danger, or any particular suffering. We should keep in mind, that this was a whaling voyage, in which the great principle of maritime policy, of uniting the interest of the mariner with that of the owner, is adopted, in its greatest force. By express contract, the compensation of a mariner is to be only a share of the net proceeds, which shall be brought to the hands of the owner. In taking the oil from the wreck, therefore, they were laboring to secure the proceeds of the voyage, upon which their compensation depended, which was enhanced by every barrel ultimately saved. I do not think that the circumstances were such as to entitle them to be considered as salvors, for merely placing the remnants of the ship, and the oil, out of the reach of the waves.

The men worked only during the day, not being pressed for time, subsisted upon the

provisions of the ship, and acted under the direction of her officers. The captain exhibited great ability, promptness and energy, in the trying and novel circumstances in which he was placed; and all parties concur in paying a deserved tribute to his merit. But the crew had no responsibility, except that of obedience to his commands.

2. The next question is, what are the rights of the officers and crew, with respect to the schooner Hope, and the property transported in her to Oahu? The remnants of the ship belonged to her owners; but, under the circumstances, were rightfully used by the officers and crew, in building the schooner. None of the old materials could be made use of, in the form in which they were found. All had to be re-fashioned, with very great labor. The mariners were under no obligation, by virtue of their original contract, to build this vessel; and the owners of the ship acquired no right from the building of her, their materials used in her construction, being found, by the assessor's report, to have been of no value to them. In a whaling voyage, the owners are to furnish the ship, and the mariners to perform the labor. If the captain had hired a vessel, to transport the property from this island, he would have been entitled to remuneration of the expense thus incurred. If the captain and mariners employ their own vessel, they, also, are entitled to compensation.

3. The brig Delaware, purchased at Oahu, is to be deemed the property of Dr. Durfee. The purchase was made in his name; the bill of sale given to him alone. He has paid the purchase-money, and although the captain states, that he purchased her for the owners of the Holder Borden, whoever they might be, it does not appear that any of the other owners have, in any manner, ratified his acts, or participated in the purchase. For going from Oahu to the island, which I shall call "Pell's Island," and taking from thence the oil, and the few remnants of the ship, the brig was entitled to compensation, and has a lien, therefor, on the property taken on board and brought to the United States. It appears, that the officers and crew of the Delaware, have been paid by her owner, for their services in going from Oahu to Pell's Island, and taking and conveying her cargo thence to the United States, and are not now to be compensated for that service.

It is found, by the assessor, that the actual expenses incurred by the owner of the Delaware, in saving this property, including the purchase of the brig, and deducting her value at Fall River, was $11,303.12; and he has reported, that five per cent. will be a fair rate of insurance. This, I am satisfied from the evidence, is a moderate estimate. Beside the amount of expenses and insurance, the owner ought to be allowed such further compensation, as would have been an adequate inducement to him, if he had been

present, to allow his vessel to be employed in this extraordinary enterprize.

For this, including the risk of the brig, I shall allow the sum of $1650, which, added to the expenses above stated, makes an aggregate of $12,953.12. The assessor has reported, that one-third of the net proceeds would be a fair compensation to the owners of the Hope, for taking, and carrying to Oahu, the oil and remnants, which were conveyed in that vessel, and that sum, being $755.60, will be allowed to them accordingly; and as Captain Pell has not been adequately rewarded, for his peculiar and meritorious services, in the extraordinary circumstances in which he was placed, I shall award to him the further sum of $200.

The net proceeds of the oil and remnants of the ship, taken by the brig Delaware from Pell's Island, amounted to $17,628.57; deduct $12,953.12; leaves $4,675.45. The net proceeds of the oil and remnants, conveyed by the Hope, was $2266.80; deduct $755.60, and $200, leaves $1311.20; from the above sums of $4675.45, and $1311.20, will be deducted the costs of the libellants; and the residue will remain to the owners of the Holder Borden, and her officers and crew. So far as this fund is the proceeds of the remnants of the ship, it belongs exclusively to her owners. So far as it is the proceeds of the oil, it belongs to the owners, officers, and crew of the ship, in the proportions prescribed by the shipping articles. Decree accordingly.

NOTE. In The Neptune, 1 Hagg. Adm. 237, Lord Stowell, giving judgment in favor of seamen's claim for wages, in a case of wreck, where materials had been saved by them, said, as to their being considered salvors: "I will not say, that in the infinite range of possible events, that may happen in the intercourse of men, circumstances might not present themselves, that might induce the court to open itself to their claim of a persona standi in judicio. But they must be very extraordinary circumstances indeed." In The Florence [16 Jur. (pt. 1) 572], nearly thirty years afterwards, Dr. Lushington speaks of such a claim, as of novel impression in an English court; and he sustained it, on the ground, that the seaman's contract had been vacated, by an abandonment of the ship at sea, on account of damage received and the state of the elements, for the purpose of saving life, without hope of return, in good faith, and by the master's order; and so the libellants, not being seamen, might be salvors of the ship. The case of The Holder Borden [Case No. 6,600], and the American authorities cited below, do not seem to enlarge this doctrine, nor to sustain the claim of seamen to salvage reward for services rendered during the existence of the contract. Mesner v. Suffolk Bank [Id. 9,493]; Miller v. Kelley [Id. 9,577]; The Star, 14 Law Rep. 487; The Robert & Anne, Stu. Adm. 254; Nickerson v. The John Perkins [Case No. 10,252]; The Acorn [Id. 30]; The John Perkins [Id. 7,360]; Mason v. The Blaireau, 2 Cranch [6 U. S.] 240; The Wave [Case No. 17,300]. The case of The Mary Hale [Id. 9,-213] seems to go farther in favor of the seaman than the case in the text, or the cases cited. The numerous cases, already cited in The Massasoit [Id. 9,260], in which wages have been allowed, out of wreck, as salvage, or

quasi salvage, can hardly be considered, in view of subsequent decisions, as an authority for the exception.